1  David Lozano, State Bar No. 164806
   Law Offices of David Lozano, ALC
2  1900 W. Garvey Avenue South, Suite 240
   West Covina, CA 91790
3  Tel: (626) 802-5680
   Fax: (626) 209-0221
4

5  Attorney for Debtor Alethia Ann Mitchell

6

7

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                         **RIVERSIDE DIVISION**

11

12  In re:

13  ALETHIA ANN MITCHELL,                  Case No: 6:12-bk-34633-MW

14              Debtor.                     Chapter 7

15                                          **RESPONSE TO TRUSTEE'S OBJECTION
                                            TO DEBTOR'S CLAIM OF EXEMPTION
16                                          IN PERSONAL INJURY LAWSUIT**

17                                          Date:   August 20, 2013
                                            Time:   2:00 p.m.
18                                          Place:  Courtroom 225
                                                    3420 12th Street
19                                                  Riverside, CA

20

21      TO THE HONORABLE MARK WALLACE, BANKRUPTCY JUDGE, THE DEBTOR AND

22  ALL PARTIES IN INTEREST:

23  Please take notice that the Debtor respectfully submits her Response to the Trustee Objection to Debtor's

24  Claim of Exemption in Personal Injury Lawsuit (the "Objection"), filed on behalf of Larry D. Simons,

25  Chapter 7 Trustee.

1    This Response is based on the attached Memorandum of Points and Authorities, the Declarations of

2    the Debtor and Debtor's Bankruptcy Attorney, and exhibits attached hereto and incorporated herein.

3    Although pursuant to Local Bankruptcy Rules, this Response was to have been timely served by

4    August, 6, 2013, Counsel for Objecting party granted an extension to file the response until August 13, 2013.

5

Dated: August 13, 2013                    Law Offices of David Lozano, ALC

6

7

8                                                David Lozano
                                                 Attorney at law
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

The Chapter 7 Trustee is objecting to the exemption of a personal injury lawsuit described in Schedule B and C of the Debtor's petition because he believes the Debtor committed fraud when she described the personal injury lawsuit as "potential" instead of "pending" and listed the claim at the time to be worth $200,000 instead of $1,000,000. This is absurd. The Debtor made full and complete disclosure of the potential asset in her schedules. She listed the name and telephone number of the attorney handling her worker's compensation claim, and just did not have the information regarding her personal injury attorney at the time her petition was being prepared, but submitted his name and telephone number at the meeting of creditors. The word "potential" was used by Debtor's bankruptcy attorney to describe the personal injury claim because the Debtor was uncertain at the time her bankruptcy petition was being prepared as to what had or had not been filed in regards to her civil claim or claims. Since it was expected that the Trustee would call the civil attorneys on these matters to inquire about their chances of success, date of completion and final settlement amounts, debtor's attorney believed that the description of the claims listed in Schedule B and C were accurate and appropriate.

In regards to the Trustee claiming the Debtor misrepresented the value of the asset at the time of filing to be worth $200,000 instead of $1,000,000 is also wrong. The debtor listed $200,000 because that was what she truly believed she would receive once the case settled and once all applicable parties took their allowed portions. The Trustee is arguing that a mandatory settlement conference was held just prior to the Debtor filing her bankruptcy in which a $1,000,000 offer was made by the opposing party, and thus the Debtor should have listed this amount as the claim's value instead of $200,000. First, the $1,000,000 offer, if it were a true offer, included paying off the claim of the worker's compensation carrier, which at the time held a secured claim of $350,000. This meant that if the offer was accepted, the Debtor's

portion would have actually only been $650,000.  Second, the Medicare set aside also had to still be decided, and that was being proposed at $320,000.  There was $56,252 in pre-settlement loans, and approximately $250,000 in attorney's fees and costs.  Debtor knew that by subtracting all these liens, fees and costs she would be left with nothing, and thus she believed this was not a realistic offer.  Finally, Debtor's attorney advised her that if he could negotiate with the worker's compensation carrier and reduce their lien, a realistic award of $200,000 - $400,000 could result.  It was this figure ($200,000 for personal injury and $200,000 for worker's compensation) that Debtor used in her bankruptcy petition to describe her interest in the personal injury claim.

## II. **STATEMENT OF FACTS**

On February 4, 2008, while working as a lead foreman for a company called Quality Contractor Inc., Debtor was proceeding up an outside staircase when she was struck on the head by a JLG manlift, a mobile crane that carries a two man metal basket and control box.  Debtor was knocked unconscious and later received extensive medical treatment.  Her injuries include damage to her back, neck spine, arms and legs, as well as to her head, resulting in neurological trauma (*See* attached Exhibit 1).  The Debtor retained Attorney Lucy Bishop to pursue a worker's compensation claim; and later Attorney Steven Geeting to represent her in her personal injury claim.  Over the next four years debtor incurred over $8,000 in medical debt, $54,000 in credit card debt and $88,000 from the deficiency balance owing on the second mortgage when she lost her home in foreclosure.  She filed a Chapter 7 bankruptcy case on October 31, 2012 to discharge this debt and listed a worker's compensation claim and personal injury claim in her bankruptcy schedules.  But because of her neurological trauma, it comes as no surprise that the debtor, in looking back during the time that her petition was being prepared, that she was confused and uncertain in her description of her personal injury claim.  Debtor truly did not know that Mr. Geeting had filed an actual lawsuit against the company that had harmed her as she thought the process was being

1  lead by her worker's compensation attorney Lucy Bishop.  As embarrassing as this is for the Debtor, it is

2  not fraud.

3  ### III. <u>ARGUMENT</u>

4      The Chapter 7 Trustee argues that the personal injury claim was not "speculative" as described by

5  the Debtor in paragraph 21 of Schedule B of the Chapter 7 petition, but in fact the personal injury case

6  had been filed a year prior and a settlement offer had been made.  Again, the Debtor truly believed at the

7  time of filing her bankruptcy that the dominant claim was falling under her worker's compensation claim

8  and that although there was a personal injury attorney involved in a personal injury aspect of her claim,

9  she did not know to what extent this played in her overall case.  She was actually unaware that a lawsuit

10  – which in the Debtor's mind means a trial and a jury - had been filed in the personal injury aspect of her

11  claim, and although she knew Mr. Geeting was her personal injury attorney, she knows that attorneys

12  resolve matters all the time without going to trial, and that is what the Debtor believed Mr. Geeting was

13  doing.  It is important for the Court to understand debtor's physical and mental condition during the time

14  the debtor's bankruptcy case was being prepared.  The debtor was of course asked standard, regular

15  questions by her bankruptcy attorney and his staff regarding whether or not she was involved in any

16  lawsuits or legal actions.  She responded by describing her injury and giving her worker's compensation

17  attorney's name and phone number, but she was just uncertain on all other details regarding the case.  In

18  retrospect, this was not surprising considering the severe trauma to her head from her accident.

19  Furthermore, in preparing this response, it was learned that the Debtor suffered and continues to suffer

20  bouts of memory loss and neurological trauma, which explains why she continues to swear she does not

21  remember a $1,000,000 offer. Only now in retrospect that it becomes understandable that during the

22  preparation of her bankruptcy, when the Debtor was asked about her civil cases, she was confused and

23  uncertain about the details of where she was in the process of these claims. Confused and uncertain about

whether or not she was headed for trial, litigation or mediation. Confused and uncertain about any

amounts or awards she might be entitled to - but this is not uncommon.  Many debtors are indeed

confused and uncertain about the details of their civil cases, and unfortunately, when the bankruptcy

attorneys try to ascertain more detailed information, the civil attorneys many times do not answer or

respond to the inquiry not realizing the necessity of the information. As such, the bankruptcy attorney is

forced to file with just the information that has been given, with the understanding that the Trustee will

most likely ask for a continuation or will contact the civil attorneys directly. Debtor's bankruptcy

attorney David Lozano states in his attached declaration that it was his belief that the Chapter 7 Trustee

always inquires directly with a Debtor's civil attorney on matters such as this no matter what the

description states or the amount of money listed.  In this case, just as expected, the Trustee continued the

hearing after specifically stating that he was continuing the matter for the sole purpose of speaking

directly to the personal injury Mr. Geeting:

> Okay. Let me do this – I'm going to um, I want an opportunity to at least chat
> with Mr. Gidding about the civil lawsuit case so I am going to continue the matter
> to give me an opportunity to speak with him, there's anything further I need from
> you, I will circle back with you and let you know, such as if I can't find his name
> or, you know, something like that. Um

> - Recorded Transcripts of December 7, 2012 Meeting of Creditors.

This is exactly what the Debtor's attorney was expecting.  He expected the Chapter 7 Trustee to

speak directly with Debtor's personal injury attorney to ascertain all the correct and accurate information

regarding the current status of the case or cases.  If the Trustee had any problem, the Debtor and Debtor's

attorney expected the Trustee to call or write or email them to advise them that he was unable to reach

the Debtor's personal injury attorney, and if we could assist in getting the two parties together.  Instead,

the Trustee made two unanswered phone calls and closed the case. The Chapter 7 Trustee never wrote the

civil attorney a letter.  Never asked the Debtor's bankruptcy attorney to contact the civil attorney.  Never

continued the Chapter 7 case to give the Debtor or Debtor's attorney an update. Never continued the

Chapter 7 case to have the Judge order the civil attorney to appear before the Trustee. If the Chapter 7

Trustee had simply contacted the Debtor's bankruptcy attorney and told the bankruptcy attorney that he

was having difficulty reaching the civil attorney, the bankruptcy attorney would have made sure the civil

attorney spoke with the Chapter 7 Trustee. Furthermore, the Trustee cannot declare on the record that he

is going to do something which causes everyone to believe he is going to do it, then not do it, then allege

fraud on the person for not providing the information that he declared he was going to acquire.

Finally, as stated above, the Debtor Amended her Schedule B and C in December when she was

advised by her civil attorneys that the $1,000,000 offer was a real probability and because the Debtor's

personal injury attorney had negotiated the $350,000 worker's compensation lien down to $75,000. It

was then believed that the Trustee, after receiving the Amended Schedules, reviewed the claims and

exemptions and confirming that the claims were properly and fully exempt, coupled with the knowledge

of the Debtor's extensive injuries and the fact that she was now permanently disabled which would

require the need for the entire personal injury award, the Trustee filed a no asset report on January 11,

2013 and closed the case. If the debtor was attempting to defraud the Court by hiding the fact that the

claim was only $200,000, then why did she amend the claim to $1,000,000?

In regards to the Trustee citing three cases, *Daniel v. Agin, In Re Woods and In Re Yonikus* in an

attempt to support his position that the Debtor's claim of exemption for her personal injury claim be

denied - I would respectfully and wholeheartedly disagree. All three cases involve debtors who failed to

list in their schedules the asset in question. The cases go on to specifically state that the debtor

"intentionally concealed" the asset at issue. The Debtor in the present case not only listed both her

worker's compensation and personal injury claims, but she listed values for both these claims as well.

And not just values of $1,000 or $5,000 or even $10,000. The Debtor listed $200,000 for each claim –

that is $400,000 - which is an extremely high amount of money in and of itself and which would lead one

to believe that the Trustee would have insisted on inquiring and confirming the actual value before

closing the case - if not after the meeting of creditors like he said he would - then certainly after the

debtor changed both values to $1,000,000 each when she amended her schedules. The Debtor made

every attempt to alert the Chapter 7 Trustee to the true value of the claims, made no attempt to conceal

them, and disclosed them from the very beginning,

. The fact is the debtor fully disclosed her claims in her schedules and was certainly not

disingenuous. She had a crane slammed on her head. She has had 19 outpatient surgeries; she has

documented proof of neurological disorders and head trauma. All the debtors in *Daniel v. Agin, In Re*

*Woods and In Re Yonikus* did not have physical or mental disabilities, and yet they failed to disclose their

assets in their schedules. The Debtor not only listed both claims in her schedules, she listed their values

as well – and amended these values once she knew for certain the offer was real.

The Trustee in his objection also implies that the Debtor was misleading the Court when she listed

QCI, Inc. as a named defendant in the case. As it turns out, QCI, Inc. was Debtor's employer at the time

of the accident and was a subsidiary of the actual Defendant company(s) named in the lawsuit. Although

it turned out that it was not necessary to actually list the subsidiary QCI, Inc. as a named Defendant, it

was not inaccurate for Debtor to name her company in her bankruptcy petition because that was the only

defendant she knew of and it was an accurate lead to the official defendant. As such, the name QCI, Inc.

was not incorrect and the Debtor did not mislead the Trustee.

The objection fails because there is no fraud. The debtor fully disclosed that she had a personal

injury claim worth at the time $200,000 - $400,000, later amending her claim once she had a more

accurate belief that the claim would truly result in a higher amount of $1,000,000 (which didn't actually

finalized until April of 2013 after the case had been discharged).   All the time the Trustee was well

aware of the claim and its high potential prior to the closing of the case. The Trustee failed to communicate with both the civil lawyers and the Debtor's bankruptcy attorney in requesting updated information regarding the personal injury claim. The Debtor, Alethia Ann Mitchell, a 51 year old woman who is now permanently disabled and who has gone through 19 outpatient surgeries since her accident, did indeed disclose her personal injury asset in this case and is requesting that the Court deny this Objection.

## IV. **CONCLUSION**

The Objection filed by Trustee is without merit and as such should be denied. The debtor filed her case in good faith, truthfully and honestly. She disclosed the assets and their values to the best of her ability at the time of the filing and testified to such at her meeting of creditors. She provided the Trustee with the information he requested at the meeting of creditors, and was always available during the course of her case to either provide more testimony or to assist in gathering any information the Trustee requested. The debtor has extensive and severe injuries such that has caused her to be placed on permanent disability, and as such all of the money awarded to her is needed to the extent necessary for her support. As such, the Debtor respectfully requests that the Court deny the Trustee's Objection.

WHEREFORE, Debtor prays for the following:

1. That the Objection filed by the Chapter 7 Trustee Larry D. Simons be denied;

2. That Debtor's claim of exemption in her personal injury award be allowed;

3. That Debtor Chapter 7 case be returned to its discharged status;

4. For such other relief as this Court deems appropriate.

Dated: August 13, 2013

David Lozano
Attorney for Debtors

## DECLARATION OF ALETHIA ANN MITCHELL

I, Alethia Ann Mitchell, declare:

1.      I am the Debtor in the Chapter 7 bankruptcy Case No. 6:12-bk-34633-MW. Each of the facts contained in this declaration is based on my personal knowledge and if called as a witness, I could and would competently testify thereto;

2.      That on February 4, 2008, while working as a lead foreman I was struck on the head by a mobile crane injuring my back, neck spine, arms and legs, as well as my head, resulting in neurological trauma;

3.      That as a result of this injury, I retained Attorney Lucy Bishop to pursue a worker's compensation claim for me and later I retained Attorney Steven Geeting to represent me in my personal injury claim;

4.      That I file my Chapter 7 bankruptcy case on October 31, 2012;

5.      That I listed and disclosed both my worker's compensation claim and personal injury claim in my bankruptcy schedules;

6.      That I allowed the word "potential" instead of "pending" to describe my personal injury claim because I was unaware that an actual personal injury lawsuit had been filed;

7.      That I listed the value of my worker's compensation claim at $200,000 and my personal injury claim at $200,000 instead of $1,000,000 because I truly believed I would only actually receive $200,000 - $400,000 once all applicable parties took their allowed portions;

8.      That although I attended the October 23, 2012 status conference hearing, I did not hear that a $1,000,000 settlement offer had been made regarding my personal injury case;

9.      That I worked at the time of my injury for QCI, Inc. who at the time of the accident was a subsidiary of the actual Defendant company(s) named in the lawsuit;

1    I declare under the penalty of perjury, under the laws of the United States, that the foregoing is

2    true and correct, and that this Declaration was executed by me on August 13, 2013, at West Covina,

3    California.

4

5    _____

6    Alethia Ann Mitchell

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## DECLARATION OF DAVID LOZANO

I, David Lozano, do hereby declare as follows:

1.     As to the following facts, I know them to be true of my own personal knowledge, and if called upon to testify in this action, I could and would testify competently thereto;

2.     That I am the attorney of record for the debtor in the herein described Chapter 7 case ;

3.     That on or about October 31, 2012, I caused to be filed the debtors' Chapter 7 case;

4.     That I wrote the word "potential" in the Debtor's schedules to describe her personal injury claim because the Debtor was uncertain at the time her bankruptcy petition was being prepared as to what had or had not been filed in regards to her civil claim or claims;

5.     That once the Chapter 7 Trustee saw the two civil claims listed in Debtor's schedules, I expected the Trustee would call the Debtor's civil attorneys to inquire about their chances of success, date of completion and final settlement amounts;

6.     That I believed that the terminology that I used to describe the claims listed in Schedule B and C were accurate and appropriate for the response the Debtor gave when asked to describe her two civil cases;

7.     That I do remember the Debtor being confused and uncertain about the details of her two civil cases, but I find that in many clients and did not consider this to be unusual and in fact I believed that the debtor was not hiding or concealing any information regarding her case and believed the description would indeed invite the Trustee to inquire further;

8.     That  it was my belief that the Chapter 7 Trustee always inquires directly with a Debtor's civil attorney on matters such as worker's compensation and personal injury cases no matter what the description states in the schedules or the amount of money listed;

9.      That I never received a phone call, letter or email from the Chapter 7 Trustee asking for further information regarding the debtor's personal injury claim;

10.     That on December 13, 2012, after the meeting of creditors, I was informed by the Debtor that her civil attorney had advised her of a $1,000,000 offer that he wanted her to consider to be a true offer and as such I amended Debtor's schedules to reflect this amount to be for her personal injury claim and her worker's compensation claim. I listed $1,000,000 for each claim because the Debtor could still not tell me whether the claim was being paid through worker's compensation claim or her personal injury claim;

11.     That I listed debtor's employer QCI, Inc. in the description of the personal injury claim because not only was this only name the Debtor provided, it made sense because this was her employer at the time of the injury;

12.     That I have attached part of a medical report of the Debtor's entitled XII Medical Record Review dated July 7, 2010 as Exhibit 1 which reflects her physical and mental condition since the accident.

I, David Lozano, declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge.

Executed in West Covina, California on August 13, 2013.


David Lozano
Attorney at Law

EXHIBIT "1"

Re: Alethia Mitchel vs. Qualified Contractors                                7/7/2010

## XII.  MEDICAL RECORD REVIEW

There was a neurological consultation report dated 3/11/08 by Robert A. Rose, M.D. Ms.
Mitchel presented with complaints of constant neck pain located in the left side of her neck
which radiated down her left shoulder, into her left arm all the way into her left hand with
numbness, tingling and weakness in her left arm and hand. She also had constant pain in the
back of her head that radiated up over the top of the head with head pain constantly. She
described having pain in the left side of her chest in the ribs all down the chest in the posterior
axillary line region. Ms. Mitchel also complained of pain in the dorsal spine. She also
experienced headache, dizziness, lightheadedness, memory, poor concentration, and feelings of
depression and anxiety as well as upset.

Dr. Rose performed a physical examination and provided diagnoses including question of
cerebral concussion syndrome; traumatic cephalgia; cognitive difficulties; depression, anxiety,
blurred vision by history; cervicodorsal myoligamentous chronic sprain syndrome with question
of developing radiculopathy, lower cervical segment s, left; left TMJ dysfunction without
evidence of true TMJ subluxation; rib injury, left posterior axillary line, mid dorsal area from
approximately T4 through approximately T9; dorsal sprain and lumbosacral myoligamentous
chronic sprain syndrome with question of developing radiculopathy, lower segments, left; left
shoulder trauma question of internal derangement; and left hip trauma, doubt internal
derangement.

The doctor advised Ms. Mitchel to continue Naprosyn and to stop taking Lodine. He also
prescribed Zantac, Xanax and Darvocet. Physiotherapy was recommended as well as MRI of the
neck and head. Ms. Mitchel was advised to return in one month for reevaluation. Ms. Mitchel's
condition remained temporarily totally disabled.

There was a neurological reevaluation dated 7/15/09 by Dr. Rose. Ms. Mitchel noted that the
symptoms she has previously were relatively the same, perhaps slightly more intense at this time.
She experienced constant headaches and constant neck pain. She also has low back pain and
difficulty breathing.

Dr. Rose performed a physical examination, reviewed medical records and provided diagnoses
including cerebral concussion syndrome; soft tissue trauma, temporal region; cognitive
difficulties with significant depression and anxiety; blurred vision with tinnitus; cervicodorsal
myoligamentous chronic sprain syndrome; left TMJ dysfunction; left costochondral pain and left
rib symptoms; chronic dorsal sprain syndrome; lumbosacral myoligamentous chronic sprain
syndrome with probably radiculopathy; evidence of significant hematopoietic tissue; left
shoulder trauma; bilateral hip trauma, doubt internal derangement; bilateral elbow trauma, left
much worse than right; and diffuse weakness, left upper and left lower extremity secondary to
radiculopathy.

07/08/2010  18:44    8187804472                    CURTIS                          PAGE  17/32

Re: Alethia Mitchel vs. Qualified Contractors                              7/7/2010

Ms. Mitchel was advised to undergo epidural injections for her neck, discogram for her back, and surgery to her left shoulder. She was also advised to continue physical therapy twice a week for about four weeks or eight more sessions. The doctor prescribed medications including Celebrex, and increased in Celexa. Her other medications were advised to continue as well.

There was another neurological reevaluation report dated 9/14/09 by Dr. Rose. Ms. Mitchel complained of pain in her low back, similar problems in her neck, headaches, nausea, blurred vision, ringing in the ears, insomnia and dizziness.

Dr. Rose performed a physical examination, reviewed medical records and provided diagnoses including cerebral concussion syndrome—resolving; soft tissue trauma, temporal region; traumatic cephalgia; cognitive difficulties; major depression developing; anxiety; blurred vision by history-decreasing; cervicodorsal myoligamentous chronic sprain syndrome; left TMJ dysfunction; left rib injury from T4-T10; dorsal chronic sprain syndrome; lumbosacral myoligamentous chronic sprain syndrome with probably radiculopathy; evidence of significant hematopoietic tissue; left shoulder trauma; bilateral hip trauma left worse than right, doubt internal derangement.

The treatment recommendations included a third epidural injection to her neck; cervical surgery; left shoulder surgery; three epidural injections over a six to eight week. The patient needed to undergo surgery to the left shoulder which has significant internal derangement with Dr. Gregorious. The patient needed to have a single-prong cane as well as a walker. Ms. Mitchel was also noted to have her support devices at home for a bathtub and toilet and she has now changed her medications to primarily use Tylenol #4. It was noted that the anti-depressant she has was Citalopram and she needed to be seen by a psychiatrist for the constant increase pain that she has had for one and a half years and the increasing depression that has occurred as a result of that pain. Ms. Mitchel was advised to return for reevaluation in the next four to six weeks.

## XIII.  DIAGNOSES AS PER DSM-IV

On a psychodiagnostic basis, the most appropriate categories of mental disorder as applied to Ms. Mitchel would be as follows:

**Axis I:**      **Episode of Mental Disorder**

| | |
|---|---|
| 311.00 | Depressive Disorder Not Otherwise Specified with anxiety |
| 294.10 | Post-Concussive Syndrome |
| 316.00 | Psychological Factors Affecting Medical Condition (stress-intensified headache, teeth grinding, neck/shoulder/back muscle tension/pain, nausea and abdominal pain/cramping) |

EX 1  pg 2  of 5

Re. Alethia Mitchel vs. Qualified Contractors                                    7/7/2010

**Axis II:**      **Personality Disorder**

　　　　V71.09          No Personality Disorder

**Axis III:**     **Physical Disorders and Conditions**

　　　　Physical conditions and diagnoses according to appropriate specialist(s)

**Axis IV:**     **Psychosocial and Environmental Problems**

　　　　Occupational Problems

**Axis V:**      **Global Assessment of Functioning (GAF)**

　　　　GAF = 50 (current)

　　　　Symptoms cause serious impairment in social and occupational functioning to the
　　　　point that Ms. Mitchel would be unable to hold a job at this time.

## XIV.  SUMMARY

Ms. Alethia Mitchel, a 48-year-old lead person for Qualified Contractors, completed psychiatric
evaluation and psychological testing on 6/26/10 at the Pomona Willow Street office.

Ms. Mitchel began her employment at Qualified Contractors in 1/07. Her last day of work there
was on 2/4/08.

The history of injury, as reported by the applicant, has been described above and, for brevity's
sake, will not be repeated here.

In this particular case, a 48-year-old lead person for Qualified Contractors, an employee who
worked there for approximately one year, revealed a history of depressive and anxious emotional
complications of physical pain, disability and altered activities arising from industrial injuries
involving primarily her head, neck, back, left shoulder and ribcage. On 2/4/08 Ms. Mitchel was
walking up a flight of stairs when she was struck in the head by a basket of a man lift weighing
over 2,000 pounds. She was wearing a hardhat, but the impact was so intense that she was
knocked unconscious. Ms. Mitchel was escorted to the Sun City Medical Clinic. On 2/6/08, Ms.
Mitchel consulted at the Rhino Valley Medical Hospital. Ms. Mitchel underwent a CAT scan
which revealed a concussion. There also were indications that there was damage to her brain
stem. On 5/1518, while on disability, Ms. Mitchel was terminated. Ms. Mitchel consulted with
Dr. Robert Rose, a neurologist. There were recommendations for left shoulder surgery. Ms.
Mitchel consulted with Dr. James Rho, a pain management specialist, who administered steroid

EX ___1___ pg _3_ of _5_

07/00/2010  10:44    810/004472                    CURTIS                    PAGE  19/32

Re: Alethia Mitchel vs. Qualified Contractors                              7/7/2010

injections to her left shoulder and hips without benefit. On 5/25/10, Ms. Mitchel underwent left
shoulder arthroscopic surgery by Dr. Gretouits. Ms. Mitchel consulted with Dr. Bergey, an
orthopedic surgeon.    A cervical spine discogram was recommended.    Despite further
conservative treatment thus far, there has been persistent pain, disability and mental confusion.
As a result of the persistent pain and disability, Ms. Mitchel developed symptoms including
depression, anxiety, irritability, insomnia, diminished sexual drive and deficits in her attention,
memory and concentration.  There were also stress-related physical symptoms including
headaches, nausea and abdominal pain/cramping.  There4 has been persistent difficulty with
cooking, vacuuming, gardening, driving, washing dishes, walking more than short distances and
making her bed. Due to the persistence of symptoms, Ms. Mitchel has been unable to return to
work. Unfortunately, due to the physical pain and disability involving primarily the cervical
spinal and lumbar spinal conditions with associated pain radiated in her hips and the post-
surgical left shoulder condition; due to the post-concussive reaction with headache and impaired
condition; due to the other stress-aggravated medical symptoms including the headache, teeth
grinding, neck/shoulder/back muscle tension/pain, nausea and abdominal pain/cramping; and due
to the resultant depressive mental disorder with damaged self-esteem, emotional
withdrawal/mistrust, psychological fatigue cognitive impairment with concentration/attention/
memory deficits. there would be residuals of permanent mental and behavioral impairment to a
marked degree, significantly impeding useful functioning according to the AMA guides with a
GAF of 50 according to the DSM-IV with a WPI of 30.

Upon examination, Ms. Mitchel exhibited abnormal behavior with manifestations of visible
anxiety and a depressive facial expression when describing the ongoing pain in her left shoulder.
In addition, in clinical interview, there were emanations of worry at that time.  As well, there
were elements of confusion, fatigue and frustration.  There were also issues of lowered self-
esteem, diminished self-confidence and apprehension about an unknown future.

The following medical opinions have been offered based upon the assumption that the facts
gleaned from the applicant and other cited sources are basically correct and accurate.  I would
reserve the option to change my opinions upon the receipt of additional records or information
from other sources.  It would be requested again that I be offered an opportunity to review all
available documents in this case.  However, based upon the information available at this time,
the following conclusions and recommendations will be offered with reasonable medical
certainty.

It would appear from the history and examination that Ms. Mitchel has been temporarily totally
disabled on a combined orthopedic and emotional basis from her last day of work at Qualified
Contractors on or about 2/4/08 to the present.

Although there may be some further expected slow change in the positive direction, and although
Ms. Mitchel may need continued supportive psychotherapy, it would not be expected that further
substantial recovery or deterioration would be anticipated in the next year beyond the projected
estimate of permanent emotional impairment set forth below.

EX 1  pg 4  of S

Re: Alethia Mitchel vs. Qualified Contractors                          7/7/2010

The degree of permanent emotional impairment would be estimated as marked degree of permanent mental and behavioral impairment significantly impeding useful functioning according to the AMA Guides.

The AMA Guides set forth issues for the doctor to assess relevant to the individual's attitude and other issues as follows: The physician should initially assess matters of motivation, secondary gain and fiscal incentives. Ms. Mitchel's motivation to recover appeared average, but impaired by aspects of depression. There were not any discernable indications of malingering for secondary gain. Overall, Ms. Mitchel and her injuries were deemed to be of average credibility.

In formulating the following estimation of psychological impairment, there was no information available from work evaluations, rehabilitation programs, day care programs, community mental health centers, shelter workshops or hospital discharge summaries. The reader would be referred to the medical record review section, if any, of this report above for an analysis of ancillary sources of information. Likewise, there was no reliable information gleaned from observing Ms. Mitchel complete the pencil-and-paper psychological tests such as the MMPI-2. The effects or side effects of psychotropic medications would not be a significant determinant of permanent emotional impairment in this particular case.

The method of evaluating psychological impairment according to the AMA guidelines involves the assessment and recording of the extent of function in four main categories, areas or aspects of functioning to be estimated in five classes of impairment as set forth within the Mental and Behavioral Disorders Impairment Chart below.

EX 1 pg 5 of 5

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
1900 West Garvey Avenue South, Suite 240, West Covina, CA 91790

A true and correct copy of the foregoing document entitled (*specify*):   RESPONSE TO TRUSTEE'S OBJECTION TO
DEBTOR'S CLAIM OF EXEMPTIONS IN PERSONAL INJURY LAWSUIT

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
_____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that
the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated
below:

☐ Service information continued on attached page

2. **SERVED BY UNITED STATES MAIL**:
On (*date*) _____08-13-13_____, I served the following persons and/or entities at the last known addresses in this
bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United
States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that
mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

3. **SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method
for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served
the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to
such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration
that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is
filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 08/13/13 | Madlelynn Caballero | |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Honorable Judge
Mark S. Wallace
411 West Fourth Street, Suite 6135
Santa Ana, CA  92701

Helen R. Frazer
Atkinson Andelson Loya Ruud & Romo
12800 Center Court Drive, Suite 300
Cerritos, CA 90703

Chapter 7 Trustee
Larry D. Simons
7121 Magnolia Ave
Riverside, CA  92504

U.S. Trustee Riverside
3801 University Avenue, Suite 720
Riverside, CA  92501

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**